UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Robert M. Illman, Magistrate Judge

REARDEN, LLC, et al.,              )
                                   )
          Plaintiffs,              )
                                   )
vs.                                )   No. C 17-04187-JST
                                   )        Related: C 15-00797-JST
CRYSTAL DYNAMICS, INC.,            )
et al.,                            )
                                   )
          Defendants.              )
_____)

                                   San Francisco, California
                                   Wednesday, October 16, 2019

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
          RECORDING 11:12 - 12:00 = 48 MINUTES

APPEARANCES:

For Plaintiffs:

                        Hagens Berman Sobol Shapiro,
                          LLP
                        301 North Lake Avenue
                        Suite 920
                        Pasadena, California 91101
                    BY: PHILIP J. GRAVES, ESQ.

                        Hagens Berman Sobol Shapiro,
                          LLP
                        1301 Second Avenue, Suite 2000
                        Seattle, Washington 98101
                    BY: MARK S. CARLSON, ESQ.

                   (APPEARANCES CONTINUED ON NEXT PAGE)

1  APPEARANCES:

2  For Plaintiffs:

3                              Wagstaffe, von Loewenfeldt,
                                Busch & Radwick, LLP
                            100 Pine Street, Suite 725
4                           San Francisco, California
                                94111
5                     BY:   FRANK H. BUSCH, ESQ.

6  For Defendants:

7                           Rimon P.C.
                            2479 East Bayshore Road
                            Suite 210
8                           Palo Alto, California 94303
                      BY:   KARINEH KHACHATOURIAN, ESQ.

9

   Transcribed by:          Echo Reporting, Inc.
10                          Contracted Court Reporter/
                            Transcriber
11                          echoreporting@yahoo.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    P-R-O-C-E-E-D-I-N-G-S

                          --oOo--

          THE CLERK:  Court calls Civil Case Number C 17-4187-JST-RMI, Rearden, LLC, et al., versus Crystal Dynamics, Incorporated, et al.

      Parties state their appearances for the record.

          MR. GRAVES:  Good morning, your Honor.  Philip Graves or Hagens Berman Sobol Shapiro, and Hagens Berman, my firm, is currently counsel for Plaintiffs, Rearden, LLC and Rearden MOVA, LLC, but for the purpose of this motion, I am appearing on behalf of the firm which has moved for leave to withdraw.

          THE COURT:  All right.

          MR. BUSCH:  Good morning, your Honor.  Frank Busch, WVBR, representing Rearden for the purposes of opposing this motion, and with me on the phone is Steve Pearlman, the CEO of Rearden, and Cindy Ivers (phonetic), the VP of Finance for Rearden.

          THE COURT:  All right.

          MS. KHACHATOURIAN (telephonic):  Good morning, your Honor --

          MR. PEARLMAN (telephonic):  Good morning, your Honor --

          MS. KHACHATOURIAN:  Sorry.  Go ahead.

1          MR. PEARLMAN:  Good morning, your Honor.  This is

2    Steve Pearlman.

3          MS. KHACHATOURIAN:  Good morning, your Honor.

4    Karineh Khachatourian, appearing by video for non-parties

5    Square Enix and Crystal Dynamics.  My client, Brian

6    Finklestein (phonetic), a representative, is also on the

7    line.

8          THE COURT:  All right.  Is that everybody.

9          MR. CARLSON (telephonic):  Your Honor.  Mark

10   Carlson is also on the line.  I'm with Hagens Berman as

11   well.

12         THE COURT:  Okay.  All right.  So we got a little

13   bit of a tangled web here, don't we.  Let me ask -- so I'll

14   just refer to -- Mr. Graves, I'll refer to your firm as just

15   HBSS for purposes of the hearing, and then Wagstaffe for the

16   -- the other counsel for -- for Rearden.

17      So why couldn't Wagstaffe serve as essentially conflict

18   counsel for the E3 discovery and the claim as it's

19   prosecuted forward, Mr. Graves?

20         MR. GRAVES:  Your Honor, because the E3 trailer is

21   now following the judge's July 12th summary judgment order

22   at the center of the case.  So, in effect, Mr. Wagstaffe or

23   the Wagstaffe firm would have to take over as lead counsel

24   for Rearden in the matter.  Hagen's Berman's ability to

25   serve Rearden's interest in this action would be extremely

1 narrowly circumscribe.  In effect, we would have to bow out
2 of most, if not all, of the action in the case going
3 forward.

4          THE COURT:  But why couldn't we just fashion that?

5          MR. GRAVES:  Well, your Honor, I'm not aware that
6 there's any California or Ninth Circuit authority that would
7 endorse that manner of dealing with a -- an immediate and
8 direct conflict.  This isn't a situation of successive
9 clients.  This is a concurrent client conflict where, in
10 effect, any steps that HBSS takes to advance Rearden's
11 interest in this case will be detrimental to Microsoft's
12 interest given the fact that evidence has been proffered in
13 this case at this point that -- suggesting -- and I want to
14 be careful.  I'm not endorsing this view obviously because
15 Microsoft is a current client of the firm, but it's been
16 suggested that Microsoft was directly and principally
17 involved in the production of the E3 trailer that is going
18 to be one of the two theories of liability going forward.

19     So any steps that are taken to advance Rearden's
20 interest to take discovery regarding the infringing activity
21 that was undertaken by the direct infringer here, DD3, in
22 producing the trailer, any discovery steps, arguments that
23 are made to advance the proposition that damages and, in
24 particular, that there is a causal nexus between profits
25 from the game, from commercializing and distributing the

1 game are attributable to the direct infringing conduct.  All

2 of that would be directly detrimental to Microsoft's

3 interests given the fact that there's evidence that's been

4 proffered suggesting that Microsoft is directly involved in

5 causing the infringing activity to occur.

6      THE COURT:  All right.  So -- so on behalf of

7 Wagstaffe, I mean, you hear their arguments as to why they

8 have a -- a conflict.  Do you still maintain that there is

9 no conflict of interest and that one is unlikely to arise?

10      MR. GRAVES:  Yes, your Honor.  This is a case

11 where Rearden is trying to sue Crystal Dynamics for Crystal

12 Dynamics' conduct.  So you have -- you have two indicia that

13 there's no conflict.

14      First of all, Rearden hasn't identified a conflict, and

15 neither has Microsoft.  Microsoft is fully capable of

16 policing any conflicts it perceives with its counsel.  The

17 fact that that doesn't happen already suggests that there's

18 no concern from any client.

19      The more important point is we not only don't know, but

20 it wouldn't be enough anyway to find that there's some

21 negative economic impact on Microsoft.  That's the very

22 first comment to the new Rule 1.7.  I don't see it addressed

23 in any of the cases they cite, which it wouldn't be because

24 all the cases are from before that time.  It is now crystal

25 clear under California law that the mere fact that your

conduct may have an economic harm on a currently represented
client in another matter is not a conflict. And the reason
that that matters is (a) firms couldn't operate, firms
couldn't conflict check if you had to look that many steps
down the road beyond the parties, beyond who's involved and
(b) because we don't even know that Microsoft does have such
an economic conflict. I mean, we've objected to it, and I
know there hasn't been a ruling to the surreply, but there
seems to be some suggestion that there's an indemnity
situation there. Microsoft may not care at all how this
litigation is resolved financially. So we don't look at
economics. What we look at is legal consequences. I see no
suggestion and no basis for a suggestion that there's a
collateral estoppel effect, that Microsoft would be bound by
anything that happens in this litigation. They're not a
party. They're not involved. We're not -- Rearden has not
asked for discovery against them. Rearden has not asked for
a lawsuit against them. They will not be bound.

THE COURT: But isn't that because the amended
complaint hasn't been put into play yet?

MR. GRAVES: No. Microsoft -- there's no need to
name Microsoft to advance claims against Crystal Dynamics.
There may -- and whoever is representing Rearden at the end
of all of this for general purposes may choose to amend a
complaint to say Crystal is liable for the trail.

1    THE COURT:  But -- I mean, and that includes like

2  the claims in the amended complaint regarding the E3 trailer

3  and all that?

4    MR. GRAVES:  Right.  That's -- that counsel may

5  choose to amend the complaint to allege that Crystal is

6  liable for this E3 trailer.  That's -- that's absolutely

7  correct.  But there is also the -- the main part of the

8  case, which is that Crystal also used the technology in the

9  game itself.  Again, there is no plan, to my knowledge

10  there's no suggestion that there's an imminent plan to sue

11  Microsoft on any of this, and the claims would be different

12  because it's different people doing different things, right.

13  If Crystal is liable for its conduct, for its use of this

14  technology, then that does not one way or the other

15  establish Microsoft's liability.  And if there were a

16  separate lawsuit against Microsoft, that would be resolved.

17  Clearly, Hagens Berman can't represent Rearden in that case,

18  but that would be resolved from scratch with Microsoft

19  Defendants.  There's no estoppel.

20    THE COURT:  Address those arguments, please.  I

21  mean, at this point --

22    MR. BUSCH:  Yes.  May I --

23    THE COURT:  At this point -- yeah, go ahead.

24    MR. BUSCH:  -- approach the lectern?

25    THE COURT:  I mean, we're essentially arguing over

whether or not there's a conflict.  I mean, it would seem
that it's going to be a pretty black and white answer to
that question.

MR. BUSCH:  Yes, and we believe there is.  I have
a demonstrative exhibit.

THE COURT:  All right.  Let's see.  Let me put
this on for -- you can probably just back it out a little
bit there.

MR. BUSCH:  All right.  So this is just two
slides, and I'm not entering it into evidence for the
record.  Essentially it's just demonstrative.

So the first slide shows on the left-hand side is our
situation where we -- Rearden is making a claim or the Court
inviting Rearden to make a claim, this is what --

THE COURT:  For the E3 trailer, right.

MR. BUSCH:   -- brought the conflict front and
center concerning the E3 trailer.  We have Microsoft on the
left here, Crystal Dynamics on the right.  The entities in
red are current clients of Hagens Berman.

So on the left-hand side is the situation in this case.
Now, Rearden's counsel, the Wagstaffe Firm, their primary
argument is that while there's no direct adversity here,
this is simply an economic or positional conflict, that's
not true.  An economic or positional conflict or adversity
is what we would see on the right-hand part of the slide,

where we have two different kind of subject matters of the case.  You know, there may be some similarities.  There may not be similarities, but the important point is that there's not a single subject matter, a single thing that the -- you know, that kind of traces up to both of these Crystal to Microsoft.

So if Rearden were suing Crystal on the E3 trailer and there was also some potential claim against Microsoft based on some other trailer or the media content, not including Contour, that would be an economic or positional conflict, and that's really borne out by some of the cases that have been cited and particular the GATX Airline case and the Rembrandt case, neither one of which Rearden addressed in its opposition, and I think that's very telling and very important.

So let's take a look at a slide that shows the situations in those cases, and you'll see that it's very similar to the situation that we have here.  And let's take GATX first.  That's a Northern District of California case. So GATX had defenses that it could have served with respect to a particular aircraft.  It was a case in which GATX had converted passenger aircraft to cargo aircraft, and there were claims or potential claims that there were design defects in the conversion.  So a bunch of airline owners started making demands and sending letters, and GATX filed a

1  declaratory judgment action.  Okay.

2       So Mayer Brown and Platt was representing GATX.  It

3  also represented Bank of New York, BNY, in unrelated

4  matters.  BNY turns out to have been a beneficial owner of

5  one of the aircraft that was owned by a company, Evergreen.

6  So in the initial action, GATX sued in the DJ action

7  Evergreen and a number of other aircraft owners, but BNY

8  wasn't a party in the action, okay.  And subsequently,

9  subsequently, BNY filed its own separate action, but that

10 was a year, year and a half down the road, and they moved to

11 disqualify MBP, Mayer Brown and Platt.  And Mayer Brown and

12 Platt made the argument, well, we should never -- we

13 shouldn't be disqualified in this action because BNY is not

14 a party.  In fact, they never were a party.  And the judge's

15 analysis rejected that categorically.  He said, you know,

16 first of all, you know, due to the relationships of the

17 parties, you know, maybe they were a party, but even if they

18 weren't, it doesn't matter because the ethical rules don't

19 limit the duty of loyalty to your various clients, only to

20 those that are a litigant in a particular action.

21      So even though BNY was not a party in the lawsuit,

22 Mayer Brown and Platt was still violating its ethical duty

23 to BNY by representing GATX and advancing arguments and

24 taking discovery that could potentially be used against BNY

25 as a beneficial owner of one of the aircraft at issue.

 1   So, as you can see, the relationship is very similar to
 2  what we have here.
 3       Let's take a look at another case that Rearden didn't
 4  discuss, which was the <u>Rembrandt Technologies</u> case.  That
 5  was a patent case in which Rembrandt was a patentee, and
 6  they were making allegations that everyone whose, you know,
 7  cable device is used to certain industry standard were
 8  infringing the patent.  Fish and Richardson represented
 9  Rembrandt in the patent action.  It also represented Time
10  Warner in a separate unrelated action.
11       So in the initial action by Rembrandt, Rembrandt didn't
12  sue Time Warner.  Subsequently, in a separate action, they
13  hired separate counsel to assert patent claims against Time
14  Warner.  Time Warner then jumped into the first lawsuit and
15  sought to disqualify Fish and Richardson, and the Court
16  granted the motion.  And what it said was, yes, you know,
17  Time Warner isn't a party in this lawsuit, but the fact that
18  Rembrandt is basically accusing the industry standard of
19  infringing and that Time Warner views as the industry
20  standard method as a practical matter, the arguments that
21  were being made in the first lawsuit, not involving Time
22  Warner, and the discovery that was taken there, could have a
23  detrimental impact on Time Warner's interest in the second
24  lawsuit in which Fish and Richardson was not involved.  And,
25  therefore, the Court disqualified Fish and Richardson.

Again, similar situation here where the industry standard at issue in <u>Rembrandt</u>, the aircraft at issue in <u>GATX</u> are analogous to the E3 trailer.  You know, we're not talking about a situation where we have different subject matters of the lawsuit and, you know, Rearden would have to try to kind of stitch them together down the road in order to try to leverage the discovery taken, obtained, and the arguments made here into a claim against Microsoft.  Here it the exact thing, the exact E3 trailer that's at issue in this lawsuit that Microsoft is, again, according to Crystal, implicated in -- in commissioning and causing to be made.

THE COURT:  Let me ask, Mr. Busch, if -- if they are allowed -- if Rearden is allowed to file that amended complaint to include the E3 as part of the -- the trailer, as part of the claims, doesn't that then move beyond the potential conflict for HBSS and put it into a conflict status at that point?

MR. BUSCH:  So thank you for the question.  I think that's -- that is the key question, and I think the answer is no.  There's -- you know, it's all well and good to put a why on a chart here, but what Rearden is trying to do is draw a line through the E3 trailer and the game.  This is not just about the E3 trailer.  In fact, it's not even primarily about the E3 trailer, go through both to Crystal Dynamics.  If Microsoft separately bears some responsibility

1 for the trailer and Rearden separately decides to pursue

2 Microsoft, there will be a lawsuit then.

3          THE COURT:  But won't they -- won't they -- in

4 trying to get information related to the E3 trailer, won't

5 they be implicating Microsoft in that?  I mean, won't

6 Microsoft have to, if they want, you know -- I mean, they'll

7 have to respond to discovery.  They'll have to disclose the

8 nature of their involvement and all that kind of stuff.  I

9 mean, isn't that stuff that would need to be protected as

10 their client in other cases?  Wouldn't that be -- wouldn't

11 that conflict them out of that?

12          MR. BUSCH:  So the answer is I don't believe that

13 that's correct.  I don't think that that's how the tape has

14 to run here.  I think we can get -- between the discovery we

15 get from DD3 and the discovery we get from Crystal, we can

16 put a case together.  Now, clearly, it is correct that

17 serving discovery on Microsoft would be a conflict.  We

18 can't ask them to do that.  That's an easy one for conflict

19 counsel to take over, to step in and say, here's some

20 requests for production, all right.  We're going to -- we're

21 going to work through this with you, Microsoft, as a third

22 party, and we're going to serve a subpoena.  We're going to

23 work on enforcing it.  That's the very basic purpose of

24 conflict counsel in a case.

25          So if it is -- if there is a need for discovery from

Microsoft, that's not an issue.  What there will never be in a case between Rearden and Crystal Dynamics is an order that affects Microsoft's legal interests.  Microsoft would get a fresh case if Rearden ever sued them, and by working to establish that Crystal Dynamics is liable for Crystal Dynamics' conduct in concert with DD3 -- either that's true or it isn't true -- but by working to achieve that, at worse, at absolute worse, what Hagens Berman is doing is harming Microsoft's economic interest.  And, as I said before, we don't even know if that's true.  And by rule which is, of course, not the standard in either of the two cases you just heard about, even if it were true that that was against Microsoft's economic interest, it wouldn't be good enough.

     What you didn't hear from all of that was any suggestion that there would be an estoppel, an order with an estoppel effect that Microsoft would not be able to litigate a fresh case if Rearden ever sued them.  That's where the conflict comes from.

     Let me also address the two cases.  First of all, you heard about an unpublished Eastern District of Texas case that, as -- as he presented it, that's exactly economic impact, right.  We're talking about you're trying to litigate a patent case, and you need to look through the patent case to see everybody who might have some economic

interest in the patent.  That's not the California rule.

That's exactly what this comment is directed at.

　　And then GATX.  GATX is very different.  He left out

two key parts of the GATX decision.  First, he left out the

third line of the citation from his presentation.  It's in

his brief, that it was vacated on appeal.  So there's an

authority problem just right out the gate.

　　But, beyond that, what GATX actually decided is that

when Bank of New York, the firm's client on a separate case,

came and tried to negotiate a tolling agreement for direct

claims, even though it wasn't a party to the case, that at

that moment that counsel had to know that there was a

conflict between a current client suing and a separately

represented and current client asking for a tolling

agreement on claims between the two.

　　And, just -- just to be clear, this is on page 1188.

There is discussion of -- there's dicta about whether or not

they should have known earlier, but the ultimate conclusion

is MBP did know as of the tolling agreement when a firm

knows that a client's actively engaged in settlement

negotiations with another party, then that firm has a

responsibility to run a conflict check.  MBP did not make

that check.  That's how the Court answers MBP's argument

that you can't possibly be asked to think about everyone in

the world who has an economic stake in a lawsuit if they're

not a party.

So, yes, Bank of New York was not a party, but it had demanded a tolling agreement. It had active claims that would ultimately be litigated. And that is -- that is where the case landed. Yes, there's discussion earlier in the case about they should have -- they should have thought about doing it sooner, but that's dicta and not informed by the new ethical rules, which are the rules that govern here. So, again, neither of those cases get them where their concerns are.

The -- here, again, the key point is that nothing in this case impacts Microsoft's ability to defend itself in a separate case. If there were a need for subpoenas, conflict counsel can handle that readily. It would be the easiest thing in the world. And beyond that, this may be -- we don't even know that Microsoft has an adverse economic impact, and we have pretty good indication that it doesn't because this is a motion to withdraw and not a motion to disqualify. Microsoft is the most capable litigation entity in the world. If they wanted to disqualify counsel that they felt actually had a problem, they would be here, and they're not.

So that's -- that's my point on the non-existence of a conflict here. Obviously there are other elements to the Court's analysis, and I'm happy to address those now or

1  later at your preference.

2          MR. GRAVES:  Your Honor, very little of what you

3  just heard about the <u>GATX</u> case is accurate, and I'm sure the

4  Court has or will read through the case.  But what you'll

5  see is that the judge -- the judge didn't rely on the fact

6  that -- that BNY had reached out to <u>GATX</u> to secure a tolling

7  agreement as, you know, the primary basis or the holding.

8  In fact, what the Court did was it looked at simply the

9  practical impact of MBP's continued representation of GATX

10 on developing arguments and defenses and taking discovery

11 that would be detrimental to BNY.  That was --

12          THE COURT:  So that's one of my concerns here is,

13 you know, we end up with a situation where I don't allow

14 HBSS to get out and then we do end up with a problem in the

15 case with a conflict with Microsoft, and then we're farther

16 on down the road, and yet we got to sort of start over

17 again.  I mean, what would be the harm in letting them --

18 letting them out and letting you guys proceed forward with

19 it?

20          MR. GRAVES:  So let me address both of those

21 questions.  First of all, the harm in letting them out, and

22 I think this is throughout our papers, is Rearden's not

23 going to be able to get replacement counsel, right.  This is

24 -- this is a package of cases about a complicated technology

25 and a heavily --

1          THE COURT:  What happens with the representation
2  then if they're not able to get anyone else?
3          MR. GRAVES:  Rearden's going to have to try and
4  figure it out, but they can't represent themselves.
5
6  11:18:04  THE COURT:  Right.
7          MR. GRAVES:  They need contingency counsel.
8  That's -- I mean, you have Steve Pearlman's declaration.
9  This is a 10-employee company.  And then they create
10  technology, right.  They make the technology that makes
11  Beauty and the Beast work, but when it's stolen, they can't
12  pay lawyers tens of thousands of hours to run down those
13  claims.  So, you know, what we've said in our papers is if
14  we can't find someone willing to take this slice of a larger
15  case if Hagens Berman is out, Rearden can't represent
16  itself.  Rearden doesn't have a --
17          THE COURT:  And what about your client in that
18  case?  I mean, why shouldn't we wait until there's someone
19  else lined up ready to go?
20          MR. BUSCH:  Well, because we have a conflict.  We
21  have a conflict now that, you know --
22          THE COURT:  Well, you don't have it now yet,
23  right?  I mean, you've been invited by Judge Tigar to
24  include all this stuff, but the case is also stayed pending
25  what's happening now, right?  So couldn't we wait until they

1  found somebody?

2          MR. GRAVES:  Well, as long as -- if nothing is

3  happening, if the case remains stayed, then, you know, the

4  immediate need for Hagens Berman to withdraw is relieved.

5  But Hagens -- the very next thing that is going to happen in

6  this case --

7          THE COURT:  Isn't it stayed -- isn't it stayed

8  right now?

9          MR. GRAVES:  It is stayed, but the very next thing

10  that's going to happen in this case after the Court rules on

11  Hagens Berman's motion to withdraw is 30 days later, Rearden

12  has to fish or cut bait on what it's going to do about the

13  E3 trailer, and we --

14          THE COURT:  Why shouldn't I just give Rearden a

15  certain amount of time to find new counsel and then go from

16  there and then it's an easy -- that's an easy thing.  If

17  they can't find it, then -- and they are unable to find it,

18  then I can take up the issue about whether or not it would

19  be -- Rearden would have to almost abandon their E3 claim or

20  something in order to keep you on or something?  I mean,

21  there would have to be some -- some other remedy along those

22  lines, but shouldn't I give them like 60 days to go out and

23  find counsel and, if not, then rule on your motion?

24          MR. GRAVES:  Yeah, we have no qualms about that at

25  all.  We'd be fine, you know, giving Rearden additional time

1   in which to find counsel so we wouldn't --

2           THE COURT:  So if they can't find counsel, what --

3   what is the remedy for them?  If they can't proceed forward,

4   then -- they can't proceed forward without counsel if I let

5   HBSS off, then this -- this slice -- this case is gone for

6   them?  Then that would be the -- that would be what happens,

7   right?

8           MR. GRAVES:  Well, you know, our view is that the

9   Wagstaffe Firm is currently representing them in this

10  matter.  They have current counsel, right.  They may not --

11          THE COURT:  Yeah.  What is the nature of your

12  representing?  I'm a little bit confused on that.

13          MR. BUSCH:  Yes.  It's a little bit confusing.

14          THE COURT:  Okay.

15          MR. BUSCH:  So we represented Rearden in the first

16  case, the --

17          THE COURT:  Okay.

18          MR. BUSCH:  -- SHST case, and the -- just 50,000

19  foot view, that was a case where Rearden tried to a bench

20  trial the issue of whether it owned the technology or not

21  and prevailed.  And so then these are the next round of

22  cases for the people who used the technology that was

23  stolen.

24          THE COURT:  Right.

25          MR. BUSCH:  And so there was an issue where we had

1 an injunction from Judge Tigar saying return Rearden's

2 property, and we had documents coming in under a subpoena in

3 this case, and the protective orders didn't work.  So

4 someone needed to be under both protective orders to

5 interface those issues.

6       It's clear from the record my firm has never filed

7 anything in this action other than a notice of appearance

8 before the withdrawal, and you'll notice too HBSS doesn't

9 even suggest in their opening motion that we could do this.

10 The fact of the matter is we're a four-lawyer firm.  We can

11 do narrow work.  We could be the conflicts counsel probably,

12 and I haven't discussed that with Rearden.  We'd have to

13 work it out.  But, you know, if it's a subpoena on

14 Microsoft, sure.  If it's contingency representation from

15 this point forward, against Crystal Dynamics, that's --

16            THE COURT:  You're not willing to do that?

17            MR. BUSCH:  -- that's not what we can do, and I

18 think that's clear from Mr. Pearlman's declaration.

19            THE COURT:  Okay.  All right.  So then with regard

20 to there was a -- Defendants were concerned that if new

21 counsel were to come in, that the -- you reserve the right

22 to keep all the ruling -- you want to keep all the old

23 rulings in place and not relitigate those issues, is that

24 correct?  That's the assurances that you guys wanted?

25            MS. KHACHATOURIAN:  Your Honor, this is Karineh

1 Khachatourian, appearing by video.  I think that question is

2 directed to me.

3          THE COURT:  It is.  I'm sorry.  Yeah.  I'm looking

4 right at you.

5          MS. KHACHATOURIAN:  No, no problem at all.  The

6 answer to that is yes.  I'd also, if I may, just like to add

7 that we also asked for our protection of, you know,

8 depending on how you rule on the motion to withdraw, that

9 Judge Tigar retain jurisdiction over Hagens Berman.  One,

10 because as a condition of Square Enix getting dismissed from

11 the case, we reserved our right to move forward with an

12 attorneys' fees claim at the end of the case under the

13 assumption that Hagens was still going to be in the case.

14 And if they were removed from the case, we're going to have

15 to start an entirely new proceeding.  We may have to sue in

16 Washington State.  It becomes procedurally somewhat

17 complicated, and I know in the past, when there have been

18 dismissals like that, particularly when they were contested,

19 the Court has retained jurisdiction over a future attorneys'

20 fees claim at the end of the case.  So that's one of our

21 asks.

22      We also --

23          THE COURT:  Let me tell you on that ask, the

24 difficulty I have is me telling Judge Tigar to retain

25 jurisdiction over something.  That might be a question that

1  you would have to bring to him depending on -- depending on

2  what my determination is.  Now, my determination can be

3  informed by your concerns, but as far as whether or not

4  Judge Tigar determines that he's going to retain

5  jurisdiction over their firm for purposes of attorneys' fees

6  motions, that you'd have to -- you'd have to raise with him.

7  I can suggest something, but that would have to be

8  ultimately his decision.

9          MS. KHACHATOURIAN:  Understood, your Honor.  I

10  understand that the motion was referred, and if we have to

11  go back to Judge Tigar, we will.

12          THE COURT:  Okay.

13          MS. KHACHATOURIAN:  Just to complete the thought,

14  we also request that whether it's your Honor in this regard

15  or Judge Tigar, that some court in the Northern District

16  retain jurisdiction over Hagens over discovery as if there

17  is a motion to amend filed, you know, it is our position

18  that -- and, ironically, it appears that it's Rearden's

19  position as well, that this issue about Microsoft was known

20  two years ago.  And, of course, we're going to oppose any

21  motion to amend.  There's a long procedural history in this

22  case, and from our perspective, we allege that Rearden and

23  Hagens knew about Microsoft for two years, avoided the

24  subject matter hoping they had a decent case against Crystal

25  and Square Enix.  We have spent two years whittling down the

case to one claim, and if they move to amend on the trailer,

we're not only going to vehemently oppose, but if

unsuccessful, we will interplead Microsoft into this case,

and I think the Court just needs to know that in terms of

having a full record because, as the Court has acknowledged,

what none of us want to happen after over two years of

litigation is to allow Hagens to stay in the case.

Let's say they do file a motion to amend and let's say

Crystal's not successful in opposing the motion to amend and

then Crystal will take steps to bring Microsoft in, and then

we're right back here again.

THE COURT:  So those -- there's our Microsoft

threat, you know.  I mean, doesn't that -- doesn't that make

it easy for me?  What if we just deny the motion to amend,

and that takes care of all this stuff, right, because --

MR. BUSCH:  Well, so I would say --

MR. GRAVES:  I apologize.  Motion to amend you

said?

MS. KHACHATOURIAN:  Exactly, your Honor.  I

mean --

THE COURT:  Yeah.

MS. KHACHATOURIAN:  -- Mr. Pearlman's on the line.

He can answer that question for you.  That is the elephant

in the room, do you intend to amend or not.  You can solve

your own problem by not including the trailer since you

1  haven't included it from the beginning and you knew about it

2  for two years.

3          THE COURT:  Well, that's --

4          MS. KHACHATOURIAN:  Where we are now is that --

5  that MOVA was not used in the game.  So --

6          MR. BUSCH:  I'd ask counsel not to ask my client

7  questions on a phone --

8          THE COURT:  Yeah, we can't --

9          MR. BUSCH:  -- call at a hearing.  That's wildly

10 inappropriate.

11         THE COURT:  Well --

12         MR. BUSCH:  To the Court's question, which I

13 believe was directed at me, though --

14         MS. KHACHATOURIAN:  Well, I'm not asking the

15 client.  The judge has the authority --

16         MR. BUSCH:  So what I think the --

17         MS. KHACHATOURIAN:  -- to question Mr. --

18         MR. BUSCH:  -- Court is asking is if Microsoft is

19 -- isn't --

20         THE COURT:  All right.  All right.

21         MR. BUSCH:  -- pleaded, does that make this

22 conflict analysis easy.  I think there's two -- two ways to

23 answer that question.  The first way is this is why we don't

24 allow counsel withdraw on speculative potential future

25 conflicts.  And, two, the answer is no.  If Crystal wants to

sue Microsoft, that does not require Rearden to do or not do anything. We don't know what those claims would be. We don't know why Rearden would have to have any part in them at all. And under the Federal Rules, if the Court was concerned that Crystal and Microsoft having their own dispute is going to create a conflict, that case can be severed off. It's express in the Federal Rules of Civil Procedure.

So, now, first of all, I would renew my objection to this whole surreply that they filed. Clearly, I mean, everything Crystal does here is to try to make this whole process as difficult as possible, and I think an opposition and a surreply from a Defendant on a motion to withdraw is evidence of that.

But, even more so, we don't know whether they would do this. Frankly, I'd be surprised if Crystal actually sued Microsoft, and if they did, there are so many tools that the Court would have at that point to protect the ability to move forward, and we don't know what Microsoft's response would be either. So we shouldn't speculate about any of this today, and we should be comfortable that if it happens, there's ways to make it all work.

MR. GRAVES: And, your Honor, Hagens Berman's position would be (a) that the issue of whether Crystal does or does not interplead Microsoft in the future, it's not a

1  necessary condition to the existence of direct adversity

2  now.

3          THE COURT:  Right.

4          MR. GRAVES:  You know, as shown in the cases we

5  cited -- and the Court should also take a look at the Flapp

6  (phonetic) case which was discussed in portions of the GATX

7  case that we excerpted and quoted in our reply brief.  You

8  know, the Flapp case, which is a California Supreme Court

9  case, makes it abundantly clear that it is not the existence

10  of a litigation involving two clients in the litigation

11  that's the sin quo non of direct adversity.  In that case,

12  the Court found that a lawyer couldn't even counsel, you

13  know, a -- a new client, you know, that there was a

14  potential statute of limitations issue and to go talk to

15  other lawyers because that could potentially have a

16  detrimental impact on another client of the firm that the

17  new client might sue in the future.  Okay.  So it's not

18  necessary that Microsoft be in the case.

19      And, you know, Rearden's counsel keeps proposing that

20  -- you know, suggesting that the sin quo non here is two

21  clients involved in the same litigation.  That's not the

22  fact at all as reflected in the cases that -- that we

23  discussed and cited and that haven't been effectively

24  distinguished by Rearden at all.

25      Now, if Microsoft were interpleaded into the case, of

course, that would, you know, be yet another factor requiring that Hagens Berman withdraw, but it's not necessary because the conflict, the direct adversity exists now as a result of the fact that Judge Tigar has instructed the parties to clarify their positions regarding the E3 trailer and has essentially instructed Rearden to fish or cut bait on whether they're going to amend their complaint to expressly state a claim involving that trailer.

THE COURT: All right. So if I give Rearden 60 days to provide the Court with new counsel prior to ruling on your motion, do you think that would be an adequate enough time for them?

MR. GRAVES: We would have no objection to that, your Honor.

THE COURT: All right. And what about you?

MR. BUSCH: I don't know whether it will be adequate or not, but Rearden certainly would try.

THE COURT: Okay. So what I'm going to do is I'll give -- I'll give Rearden 60 days to try to find new counsel to make an appearance in this case. At the end of 60 days, they'll need to file a notice with the Court telling me that they tried and weren't able to, and then I'll issue a ruling on your motion. Depending on what that ruling is, then I will take up the issues addressed by Crystal Dynamics as far as, you know, if new -- if new counsel is allowed to come

1  in, right, and new counsel makes their notice of appearance,

2  then I'll address the issues raised by Crystal Dynamics and

3  their objection to new counsel coming in.  If no new counsel

4  comes in, then I'll issue my order with further instructions

5  for Rearden.  Okay.

6          MR. BUSCH:  Thank you very much, your Honor.

7          THE COURT:  All right.  Everyone, have a good day.

8          MS. KHACHATOURIAN:  Your Honor?

9          THE COURT:  Yes?

10          MS. KHACHATOURIAN:  Your Honor?

11          THE COURT:  Yeah.

12          MS. KHACHATOURIAN:  Did you have any questions

13  about the motions to seal that are currently --

14          THE COURT:  Oh --

15          MS. KHACHATOURIAN:  -- before you?

16          THE COURT:  -- I did.  Actually, I didn't have any

17  questions.  Were there any oppositions to that?  I can't

18  remember.

19          MR. BUSCH:  Yes, your Honor.

20          THE COURT:  What number is that?  That's number

21  220?  I think that was Docket Number 220, right?

22          MS. KHACHATOURIAN:  Yes.  There were two motions

23  to seal by Hagens Berman, and then Crystal and Square and

24  Microsoft and DD3 through myself filed supporting

25  declarations in that all of the information that we've

1  requested to be sealed have already been sealed by Judge

2  Tigar.  I believe Rearden is opposing at least one of the

3  motions to seal, saying that it's already in the public

4  record and we've disputed that.

5       So Microsoft and DD3 had me represent that they joined

6  in our request.  And essentially we've narrowed down what

7  we've requested to be sealed.  So we're not asking for

8  everything.  But the crux of it is either there are direct

9  quotes from documents produced that are marked attorneys'

10  eyes only or they are summaries of the contents of either

11  the Microsoft agreements or documents produced by DD3.

12            THE COURT:  So those AEO -- there are AEO

13  documents produced, and there's summaries of them as well as

14  some of the quotes in them, and so those are the ones that

15  you're -- okay.  Let's see here.

16       Do you --

17            MS. KHACHATOURIAN:  Am I --

18            THE COURT:  Tell me document numbers.  Do you have

19  those document numbers with you so I can attach them to -- I

20  mean, I --

21            MS. KHACHATOURIAN:  Sure.

22            THE COURT:  These are all -- let me just double-

23  check this.  Okay.  Hold on just a second.

24            MS. KHACHATOURIAN:  So the first motion to seal is

25  Docket 204.

1          THE COURT:  Okay.  Yes, correct.

2          MS. KHACHATOURIAN:  And then --

3          THE COURT:  And that one -- and -- and that is --

4   and you don't have objections to that one, correct?

5          MR. BUSCH:  No, that's -- that's the one that is

6   opposed.

7          THE COURT:  That is the one that is opposed.

8   Okay, 204.  So I've got the other one -- I've got the other

9   one written down.  That must be 220, right?

10          MS. KHACHATOURIAN:  Correct.

11          THE COURT:  Okay.  All right.

12          MS. KHACHATOURIAN:  And that one was not opposed.

13          THE COURT:  Okay.  The 220 is not opposed.

14          MS. KHACHATOURIAN:  Now, my understanding on the

15   opposition to the first one, at least what was relayed to

16   me, was that at the time they wanted -- they being Rearden

17   wanted I guess an unnamed ethics counsel to be able to

18   review the unredacted motion to withdraw so that Rearden

19   could file an opposition, that the identity of the -- you

20   know, of the ethics counsel was never disclosed to us.

21   Because of that, Microsoft and non-party Square Enix

22   objected and said we won't be able to disclose it to

23   somebody who's not identified.  But we did allow Mr.

24   Pearlman to go to counsel's office to review the motion to

25   withdraw unredacted.

1    The disagreement between Rearden and Microsoft and

2 Square Enix, non-party Square Enix, is that they believe the

3 information is already in the public record, and we do not.

4 And we're also concerned about subject matter waiver.  I did

5 ask Mr. Busch in an attempt to resolve the dispute whether

6 they would stipulate that if the information that they

7 oppose was unsealed, that they then wouldn't take the

8 position that it was a subject matter waiver and the

9 underlying agreements and documents that have been marked,

10 they would then go and undesignate them and say they should

11 also be, you know, public.

12          THE COURT:  Right.

13          MS. KHACHATOURIAN:  And I never received the

14 response.

15          MR. BUSCH:  Two things, your Honor.  First of all,

16 that's not true.  What she -- what she said is she -- what

17 she was offering was not an unsealing but an ability to

18 share an unredacted document with Steve Pearlman.

19    The issue that remains -- and it's true that one of the

20 issues was that this made it particularly difficult for

21 ethics counsel to weigh in on this motion, but going

22 forward, if Rearden is going to hire new attorneys, they're

23 going to want to see the motion to withdraw.  It's going to

24 be the first or second question that they ask.  And right

25 now there's black text all over that motion, and every piece

1  of that -- we lay this out in our opposition -- is disclosed

2  in the public record.  I'm happy to agree that if it's

3  unsealed, it's not a subject matter waiver of anything other

4  than this document.  What we want is this document

5  unredacted in public so it can be shared with prospective

6  counsel because, otherwise, you reach out to them.  They

7  come back, and they say, well, what's -- what's under the

8  black?  What am I walking into?  And we can't answer.

9      And I will also say despite her representation that she

10  speaks for Microsoft who, again, has filed documents in this

11  action and is more than capable of appearing for itself,

12  I've met and conferred with Microsoft on specifically this

13  question.  They don't have any objections.  And Crystal

14  Dynamics' counsel knows that because I told her, and her

15  response was "I still do."  So she's speaking for herself,

16  not for Microsoft.

17      MS. KHACHATOURIAN:  Your Honor, I -- I disagree

18  with that characterization.  But regardless -- and if you

19  look at the motion to withdraw and what we've actually asked

20  to be sealed, it's a few lines.  It's not a motion that's

21  all black.  And what they're asking us to do is unseal

22  information that -- that Rearden previously joined in

23  sealing and that Judge Tigar has sealed and that Microsoft

24  has said they want their contracts to remain AEO and they

25  want this information distributed to unnamed counsel,

1 whoever they talk to. And -- and that's just not fair. We
2 relied on the protective order. We relied on the previous
3 orders of Judge Tigar to keep this information sealed, and
4 now they are coming in here and saying, no, you know, the
5 information has to be unsealed. And I'd also note that Mr.
6 Busch didn't address whether it would be a subject matter
7 waiver or not. And, furthermore, I submitted declarations
8 under the penalty of perjury saying that both Microsoft and
9 DD3 joined in our request to seal.

10      You know, there's a lot that goes into doing a
11 declaration. There's a lot that goes into, you know,
12 submitting a declaration. And, by the way, neither
13 Microsoft or DD3 were served with the request to seal. So I
14 actually was being a facilitator. As a third party, Hagens
15 Berman had an obligation to serve the designated parties
16 with the information that they had put in their motion, and
17 they didn't, and I acted as the facilitator within the four
18 court days that I had to submit a declaration to interact
19 with Microsoft and with DD3. So --

20      THE COURT: I see.

21      MS. KHACHATOURIAN: -- I don't know what
22 conversation they're referring to, but I know the
23 conversations I had.

24      THE COURT: All right. And I assume that your
25 position is you're just filing this on behalf of -- you

1 know, just out of an abundance of caution?

2     MR. GRAVES:  Exactly.  There's no Hagens Berman or

3 Rearden confidential information that is involved in this --

4     THE COURT:  Right.

5     MR. GRAVES:  -- that has been disclosed in any of

6 the briefs.  So our position is that, you know, we're fine

7 with whatever the Court orders with respect to the sealing.

8     THE COURT:  Is there a compromise here?

9     MR. BUSCH:  Well, I think if you look at what the

10 actual language is in the order, you'll see that it's not

11 the details of the contract.  I mean, my -- my concern is

12 it's especially since Rearden is now ordered within 60 days

13 to do its best to find replacement counsel, there's going to

14 be a question.  They're going to want to know.  And,

15 frankly, Hagens could have easily said the same things with

16 different cites to non-sealed records, and it's just going

17 to make everything harder.  So I'm not sure how I can

18 compromise --

19     THE COURT:  And you see that as a problem?

20     MR. GRAVES:  Speaking to me, your Honor?

21     THE COURT:  Yes.

22     MR. GRAVES:  No, I don't.  There's very little in

23 any of the briefing on this motion that has been redacted,

24 and it's -- I think it's reflected in the briefing.  I'm not

25 sure, but subsequent to the filing of hagens Berman's

1  initial brief, the parties agreed that probably I'd say two-
2  thirds, possibly more of the content that had initially been
3  redacted could be unredacted.  So -- and an unredacted
4  version of the brief, you know, unredacting the content that
5  the parties had all agreed could be unredacted was then sent
6  to -- to Mr. -- to Mr. Busch for Mr. Pearlman.

7      So -- so we don't see this as a practical issue or
8  impediment to Rearden obtaining new counsel.  That being
9  said, your Honor, I mean, Hagens Berman really doesn't have
10 a dog in the fight about, you know, what is and isn't
11 redacted.  We simply redacted out of an abundance of caution
12 the content that we believed, you know, might be at issue
13 with respect to AEO designations.

14         THE COURT:  I'll give you the last word on it.
15         MR. BUSCH:  Yeah, and it wouldn't ordinarily be my
16 practice to fight over these except for this need to get
17 replacement counsel, and, you know, I'm just predicting if
18 someone came to me and said I'd like you to do a contingency
19 evaluation.  I'm losing my lawyers on a motion to withdraw,
20 I would be deeply concerned about --
21         THE COURT:  Do you want to know the basis for --
22         MR. BUSCH:  -- what's under the --
23         THE COURT:  And you don't think there's enough
24 within the motion to explain, you know, what's out there and
25 what the nature of what's being sealed is sealed?

1          MR. BUSCH:  Correct.  I mean, I think --

2          THE COURT:  Don't you think that -- I mean,

3    doesn't the part that is unsealed, isn't that sufficient to

4    explain what the problem is and it's -- you know --

5          MR. BUSCH:  I think it is.  But I think for a

6    contingency counsel's evaluation, it's not just what the

7    problem is.  It's also what's -- you know, what the case is

8    because they're being asked to invest in a case.  So --

9          THE COURT:  I'll tell you what.  I'm going to

10   grant the motions to seal.  If you can show me some problem

11   in the next 60 days without counsel not being able to come

12   on the case because of that, some legitimate thing, then

13   I'll take that up at the 60-day mark.  All right.

14         MR. BUSCH:  Thank you, your Honor.

15         THE COURT:  So those two motions will be sealed.

16   And then 203 we'll wait for 60 days to find out, and Rearden

17   has to understand that they need to find counsel because if

18   they don't find counsel and I do follow with HBSS on this --

19   on this conflict issue, then they're going to be without

20   counsel, and they're going to be able to not proceed forward

21   in this lawsuit.  So that could be extremely detrimental to

22   them.

23      So all right.  Thank you everyone.

24         MR. GRAVES:  Thank you, your Honor.

25         THE COURT:  Have a good day.

1       MR. GRAVES:  You too.

2       THE COURT:  Thank you.

3   (Proceedings adjourned at 12:00 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF TRANSCRIBER</u>

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14  

15

16          Echo Reporting, Inc., Transcriber

17            Thursday, October 31, 2019

18

19

20

21

22

23

24

25